OPINION
Plaintiff-appellant, Mitchell Motor Parts, Inc., appeals from a judgment of the Franklin County Court of Common Pleas directing a verdict on its negligence claim in favor of defendant-appellee, the city of Columbus. For the reasons that follow, we affirm the judgment of the trial court.
On December 4, 1994, appellant's facility at 2467 Jackson Pike in Columbus, Ohio, was destroyed by fire. The city had supplied electricity to appellant since 1979. Appellant brought an action in negligence against the city alleging that the conduct of the city in maintaining the electrical power lines, poles, and related equipment fell below the applicable standard of care and that negligence allowed over 8000 volts of electricity to enter the facility, causing a fire that destroyed appellant's property. Appellant's theory at trial was that a surge arrester, designed to conduct electricity to the ground, failed allowing 8000+ volts of electricity to enter appellant's facility. Appellant claimed that the city was negligent in the way it grounded the surge arrester, and that negligence was the proximate cause of the fire.
The matter came on for a jury trial on March 15, 1999. At the close of appellant's case-in-chief, the trial court directed a verdict against appellant. The trial court journalized the directed verdict on March 25, 1999.
Appellant advances a single assignment of error as follows:
 The trial court erred in directing a verdict against the Plaintiff/Appellant since it did not follow the mandates of Civ. R. 50(A)(4), was in error as to the evidence before it and required the Plaintiff/Appellant to bear the burden of proof on the Defendant/Appellee's affirmative defenses.
"A directed verdict is proper when, after construing the evidence most strongly in favor of the nonmoving party, the court determines that the trier of fact could reach only one result under the theories of law presented in the complaint." Huffer v.Cicero (1995), 107 Ohio App.3d 65, 72, citing Grau v. Kleinschmidt
(1987), 31 Ohio St.3d 84, 90. Because a motion for directed verdict tests the legal sufficiency of the evidence, the trial court may not weigh the evidence or try the credibility of witnesses, but must give the party opposing the motion the benefit of all reasonable inferences from the evidence. Cummings v. B.F.Goodrich Co. (1993), 86 Ohio App.3d 176, 186-187; Atkinson v.Internatl. Technegroup, Inc. (1995), 106 Ohio App.3d 349. Thus, if appellant presented substantial competent evidence which, if believed, would permit reasonable minds to come to different conclusions on its claims, the trial court was required to submit the issue to the jury and deny the city's motion for directed verdict. Wagner v. Roche Laboratories (1996), 77 Ohio St.3d 116;Weidner v. Blazic (1994), 98 Ohio App.3d 321.
As in any negligence case, appellant was required to introduce evidence of: (1) the existence of a duty; (2) breach of that duty by the defendant; (3) proximate cause between the breach and some damage to the plaintiff; and (4) damage to the plaintiff.Mussivand v. David (1989), 45 Ohio St.3d 314, 318.
The parties agree that the applicable standard of care has been set forth by the Ohio Supreme Court in Otte v. DaytonPower Light Co. (1988), 37 Ohio St.3d 33. Recognizing that the delivery of electricity can be a very dangerous activity, the court stated: "We have repeatedly held that a public utility is required to exercise the highest degree of care consistent with the practical operation of its business in the construction, maintenance, and inspection of its equipment and is responsible for any conduct falling short of that standard." Id. at 38, citing Hetrick v. Marion-Reserve Power Co. (1943), 141 Ohio St. 347, paragraph two of the syllabus. The court went on to note that "the National Electric Safety Code (`NESC') controls the standards of a public utility in the installation, inspection and maintenance of its equipment which, of course, includes its transmission and distribution lines. The National Electric Code (`NEC') controls how the customer should install and maintain his own equipment and wiring." Id. at 39.
Appellant's first witness was Frank Mitchell, president and sole owner of Mitchell Motor Parts, Inc. Mitchell testified that his company was in the business of restoring and preserving Chrysler motor vehicles. In his warehouse was a large quantity of original equipment parts for vehicles dating back to the `20's, `30's, and 40's. At the time of the fire, appellant was renting the warehouse from Sepich Construction Company and purchasing its electricity from the City of Columbus Power Company.
Appellant next called Henry Bell, the Administrator of the Division of Electricity for the city of Columbus, as on cross-examination. Bell testified that the city of Columbus delivered electricity to Mitchell Motors, and there was an incident on December 4, 1994, when a power surge went into the building. Bell indicated that a surge arrester had failed and was taken down and replaced. Bell indicated that the surge arrester was there to protect the city's equipment on the power line from being damaged by a high voltage surge such as a strike of lightning. Bell denied the purpose of the surge protector was to protect the electric customer's property. He testified that the city relies on the customer's ground to protect the customer's equipment. Bell also testified that there are two separate codes involved in the distribution of electricity by the city, the National Electric Safety Code and the National Electric Code, which deals with the wiring within a building. Bell testified that the city's distribution of electricity met with the National Electric Safety Code.
Appellant then called Bernard Doran, a licensed professional electrical engineer with a private investigating firm. Doran was called to the scene of the fire on December 8, 1994, four days after the fire. Doran opined as to the cause of the fire as follows:
 In this particular case there was a failure of a surge arrester owned by the Columbus Power Plant, installed by them as best we could determine. That surge arrester failed. It was improperly grounded. It allowed the full primary voltage somewhere in excess of 8,000 volts to enter the structure. That produced numerous areas of arcing or faulting as it's technically called. That produces a great amount of heat that ignites nearby combustibles. [Tr. 49.]
Doran and Bell both indicated that the purpose of a surge arrester is to conduct and drain off any unusual surge that might occur on the line, such as lightning. Doran testified that there was a single point ground at the pole where the surge arrester failed. According to Doran, this ground did not meet National Electric Safety Code requirements:
 Q. Do you have an opinion within a reasonable degree of scientific certainty, as a professional engineer, an electrical engineer, on what path the current took in entering the building of Mitchell Motors?
A. Yes, sir.
Q. What is that?
 A. It followed the incoming secondary or your little voltage feeders, which would be 120/240.
 Q. What part did the neutral play into this event that caused the fire?
 A. The neutral of the 120/240 system is tied to a common ground point with the surge arrester that failed, as well as two other surge arresters. That is specifically forbidden by the National Electric Safety Code.
 Q. Can one say that if, in fact, there was a catastrophic occurrence of a surge arrester conducting to the side and down to the ground, that the mere fact of the electricity going into the customer's building shows that the ground is not effective?
 A. Yes. That's the definition of an effective ground by the National Electric Safety Code. It requires that the ground be effective, and that is the definition of being effective.
 Q. Did any of the current in this case flow through the neutral into the Mitchell Motors building?
A. Yes, sir.
 Q. Is that a usual way that current is to be delivered to a building?
A. Absolutely not. [Tr. 56-57.]
In connection with a demonstration involving a model, Doran also testified that there was a single point ground at the pole where the surge arrester was located:
 A. There was a single ground at this pole. The National Electric Safety Code requires that when you ground a lightning arrester, you have two choices. One is that you have a ground that goes over an extended distance, has to have four separate grounds in any running one mile as they call it. Any one-mile section has to have at least four grounds.
 They had a single point ground which is an ineffective ground. They did have an available — this top wire which is commonly called a messenger wire, it was grounded back at their grid. They also had this very top wire along the steel pole that was grounded back here at their grid. And it would have made a very effective ground too.
 For some reason they chose not to carry this conductor over and establish an extensive grounding system. It would have been under $100 in terms of money to have done that. Had they done that, the failure of the surge arrester would simply have thrown that power back to the conductors and back to the grounding grid, the voltage surge would have not entered Mitchell Motors, and would not have caused this catastrophic fire. [Tr. 64-65.]
On cross-examination, the city brought out that Doran had walked around the site, had taken photographs, and made a number of observations. Doran admitted that at his deposition, he thought that the type of ground on the surge arrester was a "butt plate ground." He indicated that it was possible there might be a ground rod buried under the surface of the soil, but he did not excavate or run any tests on the ground to determine how much electricity the ground could take. Doran, however, insisted that the main factor was that it was a single point ground, and the manner in which it was connected to the surge arresters was very dangerous.
The city also brought out that the customer's ground, the ground for the electrical equipment in the Mitchell Motors facility, was attached to a water pipe that went into a water well. A plumber had replaced the pressure tank several years before the fire. During the tank replacement, a short length of copper pipe was replaced with plastic which reduced the effectiveness of the grounding system. The National Electric Code does not approve plastic pipe as a conductor and, in fact, it is normally considered to be an insulator. However, Doran also testified that, although the ground that was in Mitchell Motors "probably was not the best ground[,] * * * [a]ny normal code-sized ground would not be able to handle that type of power [8,000 volts] at all. They were never intended to. And as I indicated, they are specifically forbidden by code from being used for that purpose." (Tr. 59-60.)
The basis for the city's motion for a directed verdict was that appellant failed to specify what portion of the National Electric Safety Code the city violated when it installed the surge arrester with allegedly substandard grounding. In its motion for a directed verdict, the city first stated that:
 It's our defense, it's kind of a contributory negligence type of defense that we are saying they are the ones who either contributed or caused the problem and it's not us. [Tr. 99.]
The city then argued:
 But in regards to what Mr. Doran said, and what I heard him say, is that he believes that the reason this fire occurred in the building is because our surge arrester, lightning arrester was not properly grounded on the pole. And he says that's pursuant to code.
 And what I am saying to you is: There has to be some sort of a time frame for all of this. Maybe what he has said is pursuant to the way the code is written today. But that wasn't the way the code was written when these wires were installed and when the system was installed.
THE COURT: We don't even know that.
 [COUNSEL FOR THE CITY]: We have no evidence to that. That's the basis for our motion. [Tr. 99-100.]
The trial court granted the city's motion on the grounds that appellant's expert made a general statement that the city's grounding device did not comply with the National Electric Safety Code, and there was no evidence nor were any tests performed to establish what was wrong with the ground or why it failed. The trial court stated:
 So I don't think you can merely sit back and say, well, the sum and substance of the testimony is by an expert witness that the City of Columbus did not buy — or I'm sorry, did not comply with the NESC. I don't think that's enough, gentlemen. I don't think it's enough. Then let the jury speculate on what that violation might have been, what the standard was, and how the city fell below it. Because I got to believe the NESC is not just some vague general term. [Tr. 140-141.]
In accordance with the law set forth above, we must look to the evidence introduced at trial to see if a directed verdict was proper in this case. Based on our review of the record, we conclude that, as a matter of law, appellant introduced insufficient evidence as to breach of duty and proximate cause to permit the negligence action to go to a jury. Through the testimony of its president, appellant established that the city of Columbus delivered electricity to appellant's facility. As a public utility, the city was required to exercise the highest duty of care consistent with the practical operation of its business in the construction, maintenance, and inspection of its equipment and was responsible for any conduct falling short of that standard. Moreover, the National Electric Safety Code controls the standards of a public utility in the installation, inspection and maintenance of its equipment which, of course, includes its transmission and distribution lines. Otte, supra, at 39.
Through the testimony of the administrator of the Division of Electricity for the city, appellant established that a surge protector failed and had to be replaced and that at least 8000 volts of electricity went into the building on the date of the fire. Appellant failed, however, to establish through the testimony of its expert that the city improperly grounded the surge arrester and that improper grounding caused the surge arrester to fail, thereby permitting an excessive amount of electricity to enter appellant's facility.
Appellant's expert merely testified that, based on his observations at the scene four days after the fire, the surge protector that failed was not grounded in accordance with the National Electric Safety Code. Appellant's expert failed to specify what portion of the National Electric Safety Code the city allegedly violated. The expert performed no tests, nor did he do any excavation to determine what type of ground existed. His testimony indicated that the fire occurred because a large surge of electricity went into the building. His conclusion that the surge entered the building because of a faulty ground was not supported by any evidence.
Appellant's logic was circular in that he merely testified that the ground was ineffective because a catastrophic event occurred. When asked if the mere fact of the electricity going into the building was evidence of an ineffective ground, the expert answered: "Yes. That's the definition of an effective ground by the National Electric Safety Code. It requires that the ground be effective, and that is the definition of being effective."
In effect, appellant attempted to convert his action for negligence into one of strict liability. Counsel for appellant candidly admitted at oral argument that, although strict liability is not the standard for liability against a public utility, "it ought to be." In Otte, at 39, the Ohio Supreme Court held that strict liability in tort for damages caused by neutral-to-earth voltage is not a cause of action that may be asserted against a public utility.
In its ruling, the trial court stated that this was not a strict liability case, and that appellant had failed to present evidence of what section of the National Electric Safety Code had been violated. Based on our review of the record, we believe that the expert's testimony was speculative, and that merely stating that a surge entered appellant's building and, therefore, the surge arrester was improperly grounded is not substantial competent evidence which, if believed, would permit reasonable minds to come to different conclusions on its claim. Accordingly, the trial court was correct in granting a directed verdict for the city.
Based on the foregoing, we overrule appellant's single assignment of error, and affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
PETREE and BOWMAN, JJ., concur.